IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION ONE

| | | |
|---|---|---|
| In the Matter of the Personal Restraint of | ) ) ) | No. 82855-0-I |
| HERNAN BANAS DIVINAGRACIA, | ) ) ) | UNPUBLISHED OPINION |
| Petitioner. | ) | |

BOWMAN, J. — Hernan Banas Divinagracia seeks relief through this personal restraint petition (PRP) from his conviction of one count of first degree child molestation. He contends his trial attorney provided ineffective assistance of counsel. We disagree and deny the petition.

FACTS

E.M. grew up in Western Washington with her younger brother and her parents, Michelle and Michael.[1] E.M. and her brother spent a lot of time with their great-uncle Divinagracia, his wife Norma,[2] and their children. Divinagracia played a patriarchal role, and many in the extended family revered him.

When E.M. was around 10 or 11 years old, she began resisting her visits with Divinagracia. Later, in her high school years, she began to suffer academically and socially. While discussing these concerns with her mother in April 2017, E.M. broke down and revealed that Divinagracia sexually assaulted

_____

[1] For E.M.'s privacy, we refer to her parents by only their first names and intend no disrespect by doing so.

[2] We refer to the Divinagracia family members by their first names for clarity and for privacy and intend no disrespect by doing so.

Citations and pin cites are based on the Westlaw online version of the cited material.

her as a child. E.M. said she did not "understand fully what was going on at the time," but she specifically recalled two instances before the age of 10 where Divinagracia touched her inappropriately. The first time it happened, E.M. was asleep on a rollout floor mat next to Divinagracia and Norma's bed. During the night, Divinagracia got "down onto the floor with [E.M.]" and touched her under her clothing. On the other occasion, E.M. and her brother were playing in an outdoor "kiddy pool" in Divinagracia's backyard. Divinagracia was sitting on the deck, watching the kids play, when he called E.M. away from the pool and told her to sit on his lap. When she did, he put an outdoor pillow over her legs, reached inside her swimsuit, and touched her.

Michelle and Michael decided to confront Divinagracia about E.M.'s allegations before contacting the police. But first, Michael reached out to Divinagracia's daughter Dinah and repeated E.M.'s accusations. Dinah agreed to meet with Michael, Michelle, and her parents. Michael asked Dinah not to say anything to her father beforehand and she agreed, but just before the meeting, Dinah e-mailed Divinagracia warning him that E.M. said he "sexually molested" her and that Michael and Michelle were on their way over to confront him.

On May 17, 2017, Michael, Michelle, Dinah, Divinagracia, and Norma met at the kitchen table in Divinagracia's house. Michael and Michelle explained E.M.'s academic and emotional troubles and her revelations about the sexual abuse. Norma began to cry. According to Michelle and Michael, Divinagracia immediately became "defensive" and suggested "wrestling" or "horsing around"

2

was not wrong.[3]  Michelle and Michael were shocked and believed this behavior suggested guilt, so they continued to press the issue.  Dinah also pressed Divinagracia for "the truth" and told her family for the first time that she was a survivor of sexual abuse as a child.[4]  Norma and Dinah then began to cry "uncontrollably."  Norma became so "overwhelmed" that she and Dinah left the room.

Michael then "pretended" to receive a phone call but instead turned on his cell phone and recorded the rest of the conversation.  As the questioning intensified, Divinagracia "finally" said, "I did it."  Michael believed the recording was Divinagracia's confession that he molested E.M.  Michelle did not know about the recording until after the meeting.

After Divinagracia's admission, Michelle and Michael decided to leave. On their way out, Michael took Dinah into the garage and played her the recording.  Dinah asked Michael to delete the recording.  Michael agreed, "thinking that [he] didn't need it."  Michael believed Divinagracia had "integrity" and "would come forward," plus he knew Dinah "heard the recording."  But Divinagracia did not come forward and Dinah later claimed the recording did not contain any admission or confession by her father.

Meanwhile, E.M.'s high school counselor, a mandatory reporter, informed law enforcement of E.M.'s allegations.  The police contacted Michelle and Michael, who gave statements about E.M.'s claims and their confrontation with

---

[3] According to Dinah, these comments came up in response to her e-mail and Divinagracia was just trying to understand what "sexual molestation" meant, seeking to clarify that wrestling and horsing around "didn't count."

[4] The abuse was not by a family member.

3

Divinagracia.  Neither mentioned that Michael recorded part of the May 17, 2017 conversation.  Police later learned about the recording and interviewed Michelle and Michael again.

E.M. submitted to a child forensic interview in June 2017.  Among other things, E.M. told the interviewer that Norma had been on the bed when Divinagracia assaulted her on the bedroom floor.  She said Norma did not wake up because she sleeps with earplugs.  In October 2017, Divinagracia retained an attorney to represent him.

In August 2018, the State charged Divinagracia with one count of first degree child molestation for the "bedroom incident."  In April 2019, the State amended the information to add a second count of first degree child molestation for the "pool incident."

On April 4, 2019, defense counsel moved to suppress any evidence about the May 17, 2017 conversation between Divinagracia and E.M.'s parents that Michael "surreptitiously recorded."  He argued Michael violated Washington's privacy act (WPA), chapter 9.73 RCW, by recording Divinagracia without his consent.  The State responded and argued that the WPA did not apply to the recording because the conversation took place in an open area and involved several people.  Alternatively, it contended that since Michelle did not participate in the recording and did not listen to it, the court should not prevent her from testifying about the conversation.

On April 11, 2019, the court heard argument on Divinagracia's motion to suppress.  It ruled that Michael recorded the conversation in violation of the WPA

4

and could not testify at trial about the May 17, 2017 conversation.  But the trial court found that Michelle "did not act in concert, nor complicit, with [Michael] in the recording of the conversation" and that her memory was untainted because she never heard the recording, so it ruled that Michelle could testify about the conversation.  Around this time, Divinagracia's counsel hired another attorney to act as cocounsel.  The defense did not ask the court to reconsider its ruling or move the court for any further relief as to the May 17, 2017 recording.

Trial began in November 2019.  The State presented testimony from police detectives, E.M., her brother, Michael, and Michelle.  E.M. recounted the incidents of abuse.  Michelle testified about the family meeting on May 17, 2017.  She said that after Dinah and Norma left the room, she and Michael continued to question Divinagracia, and he "finally looked up at me and he just kind of put his hands up in the air and said, I did it."

Both Dinah and Norma testified for the defense as well as Divinagracia's close friend.  Divinagracia did not testify.  Dinah and Norma also testified about the family meeting but said that Divinagracia denied the allegations.  The defense elicited testimony from the witnesses that Divinagracia treated E.M. equally with her brother and that no one had reason to believe he acted inappropriately toward E.M. before her allegations surfaced.

The jury convicted Divinagracia of first degree child molestation as charged in count 2 for the pool incident but could not reach a verdict on the

bedroom incident as charged in count 1.[5]  On January 17, 2020, the trial court sentenced Divinagracia to an indeterminate sentence of 54 months to life.

Divinagracia seeks relief from his restraint via this PRP.  In support, he submitted declarations from both trial counsel, Norma, Dinah, and Dinah's brother.  In its response, the State submitted a declaration from the prosecutor who litigated the case below.

ANALYSIS

Divinagracia claims he "received deficient legal representation during pretrial proceedings and at trial, in violation of the Sixth Amendment Right to effective assistance of counsel."  U.S. CONST. amend. VI.  According to Divinagracia, "but for the deficiencies of trial counsel, [he] would not have been convicted of the underlying offense."  In the alternative, Divinagracia asserts we should order a reference hearing.  We disagree.

Relief through a PRP is extraordinary.  In re Pers. Restraint of Coats, 173 Wn.2d 123, 132, 267 P.3d 324 (2011).  A petitioner may seek relief through a PRP when he is under unlawful restraint.  RAP 16.4(a); In re Pers. Restraint of Cashaw, 123 Wn.2d 138, 149, 866 P.2d 8 (1994).  The petitioner may raise either constitutional or nonconstitutional error.  In re Pers. Restraint of Davis, 152 Wn.2d 647, 671, 101 P.3d 1 (2004).  To obtain relief on a constitutional error such as Divinagracia asserts here, the petitioner must prove by a preponderance of the evidence that the error actually and substantially prejudiced him.  Id. at 671-72.  The petitioner "must state with particularity facts which, if proven, would

---

[5] The State later moved to dismiss count 1 without prejudice, which the court granted on December 10, 2019.

entitle him to relief" and may not rely on bald assertions or conclusory allegations.  In re Pers. Restraint of Rice, 118 Wn.2d 876, 885-86, 828 P.2d 1086 (1992).

The Sixth Amendment and article I, section 22 of the Washington Constitution guarantee effective assistance of counsel.  State v. Grier, 171 Wn.2d 17, 32, 246 P.3d 1260 (2011) (citing Strickland v. Washington, 466 U.S. 668, 685-86, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984)).  An ineffective assistance of counsel claim presents mixed questions of law and fact that we review de novo.  State v. K.A.B., 14 Wn. App. 2d 677, 707, 475 P.3d 216 (2020) (citing State v. Linville, 191 Wn.2d 513, 518, 423 P.3d 842 (2018)).  A defendant alleging ineffective assistance must overcome a strong presumption that counsel's performance was reasonable.  State v. Kyllo, 166 Wn.2d 856, 862, 215 P.3d 177 (2009).  To establish ineffective assistance of counsel, Divinagracia must show (1) defense counsel's conduct was deficient and (2) the deficient performance resulted in prejudice.  Grier, 171 Wn.2d at 32-33.  An attorney's performance is deficient if it falls below an objective standard of reasonableness.  Strickland, 466 U.S. at 687-88.

Counsel has a duty to conduct a reasonable investigation under prevailing professional norms.  In re Pers. Restraint of Elmore, 162 Wn.2d 236, 252, 172 P.3d 335 (2007) (citing Strickland, 466 U.S. at 691).  We assess any particular decision not to investigate for reasonableness, "giving great deference to counsel's judgments."  Id.; State v. West, 185 Wn. App. 625, 638, 344 P.3d 1233 (2015).  If we can characterize counsel's actions as legitimate trial strategy or

7

tactics, performance is not deficient. Kyllo, 166 Wn.2d at 863. But an attorney performs deficiently when "there is no conceivable legitimate tactic explaining counsel's performance." State v. Reichenbach, 153 Wn.2d 126, 130, 101 P.3d 80 (2004). The relevant question is not whether counsel's choices were strategic, but whether they were reasonable. Grier, 171 Wn.2d at 34.

To determine whether any deficient performance resulted in prejudice, we apply the same standard in a PRP as we do on appeal. In re Pers. Restraint of Crace, 174 Wn.2d 835, 846-47, 280 P.3d 1102 (2012) ("[I]f a personal restraint petitioner makes a successful ineffective assistance of counsel claim, he has necessarily met his burden to show actual and substantial prejudice."). So Divinagracia must show there is a reasonable probability that but for his counsel's deficient performance, the result of the trial would have probably been different. Strickland, 466 U.S. at 694.

Pretrial Litigation

Divinagracia contends trial counsel performed deficiently by failing to "consider" adequately the consequences of moving to suppress testimony about the May 2017 conversation recorded by Michael. He further asserts trial counsel failed to "identify or present evidence [at the suppression hearing] that would have demonstrated that Michelle had been involved in the planning of the confrontation and the illegal recording." According to Divinagracia, an adequate pretrial investigation would have unearthed evidence before the suppression motion that Michelle participated in the plan to record him. We are unpersuaded.

1)  Suppression Motion

Divinagracia's trial attorney moved to suppress "testimony about the conversation recorded by Michael" in April 2019, about a year and a half into his representation of Divinagracia.  Trial counsel now asserts:

> Upon filing that motion, I had not considered the possibility that Michelle . . . might be permitted to testify regarding the contents of the May 17, 2017 meeting with Hernan Divinagracia even if the Court ruled that the secret recording and the testimony of Michael . . . would be suppressed.

While counsel may not have considered the possibility of Michelle testifying about the meeting when he filed the motion to suppress, it soon became a central issue in the pretrial litigation when the State raised the issue in its response brief.[6]  And rather than withdraw his motion, defense counsel chose to address the issue in his reply by focusing on Michelle's involvement in engineering the confrontation itself.  He argued that "Michelle did know there was a recording" and that Michael and Michelle "continued to work as a team during the recording," so Michelle "should also be barred" from testifying.  During the suppression hearing, defense counsel distinguished the case law cited by the State that suggested only witnesses complicit in the recording itself should be restricted from testifying.

Proceeding in this way fell within the legitimate tactical choices open to the defense, to which we defer.  While the strategy proved unsuccessful, we cannot say defense counsel acted deficiently by pursuing it.

2)  Investigation

---

[6] Divinagracia acknowledges this in his reply brief on review.

The record shows that trial counsel reviewed Michael and Michelle's statements to the police, interviewed Michelle, and was in frequent contact with Dinah before the suppression hearing. Based on the information gleaned from his investigation, counsel told the court at the suppression hearing that "the facts we have give us no basis to dispute what [the State is] now saying, that Michelle found out [about the recording] right after[ ] [the meeting]."

Dinah now says that Michael told her he planned to record his confrontation of Divinagracia and that Michelle was present during that discussion. But Dinah offers no information about why she did not convey this fact to trial counsel. Dinah implies but does not declare that counsel did not ask her about the confrontation. Yet she acknowledges that she discussed the case with trial counsel and declares that she is "certain that I told [defense counsel] about the confrontation at my parents' home on May 17, 2017 and of the fact that Michael . . . had made a recording of that event." That she failed in her discussions of the case with trial counsel to reveal that Michelle knew Michael planned to record her father does not render counsel's investigation deficient.

Trial

Divinagracia claims defense counsel performed deficiently at trial in three respects. (1) Counsel did not present testimony from Dinah about the recording to rebut Michelle's trial testimony, (2) he did not offer evidence that Divinagracia denied the allegations when confronted, and (3) he failed to cross-examine E.M. about her claim that Norma wore earplugs at night. Divinagracia contends these

errors allowed Michelle's confession testimony to go unrebutted and E.M.'s allegations unimpeached. We disagree.

### 1) Recording Evidence

Divinagracia argues "defense counsel should have presented evidence surrounding the illegal recording as it demonstrated that both Michael and Michelle were deceitful and that it would cast doubt about their other claims to the jury."[7] But defense counsel made a reasonable tactical decision to avoid the topic of the recording at trial because the jury could have viewed it either favorably or unfavorably to the defense. For example, Divinagracia suggests the jury would have seen Michael as a liar because it "defies logic and reason" to believe that Michael deleted the recording if it in fact contained a confession. But the same holds true for Dinah and her request that Michael delete the recording if it in fact proved her claim that Divinagracia did not confess. Also, Michael's nondisclosure of the recording in his initial statement had little value given his subsequent cooperation with police and his explanation for deleting it.

Rather than wade into the evidentiary quagmire surrounding the recording, defense counsel reasonably elected to combat Michelle's account of Divinagracia's confession with direct testimony from Dinah and Norma—two other witnesses with firsthand knowledge of the conversation. Such tactical choices do not amount to deficient performance.

---

[7] In his trial memorandum, trial counsel asked the court to "exclude any mention that the [May 17, 2017] conversation was recorded."

2)  Divinagracia's Denial

Divinagracia also claims defense counsel performed deficiently because he did not seek to admit the denials Divinagracia made during the May 2017 meeting as "excited utterances" under ER 803(a)(2).  He relies on the statements in Dinah and Norma's declarations in support of his PRP that Divinagracia appeared "stunned" and "in shock" during the confrontation, thereby "still under the influence of the events," making his denials exceptions to the hearsay rule.  ER 802, 803(a)(2).  But nothing in the record shows defense counsel knew of these descriptions at the time of trial.  Indeed, at trial, Norma testified that Divinagracia appeared calm and "kind of sad" when confronted by Michael and Michelle.  Dinah also testified that before she and Norma left the room, "[m]y mom was crying uncontrollably, as was I, and my dad seemed to be sad."  The only testimony at trial that Divinagracia appeared "shock[ed]" and "upset" was when he learned that Dinah was a survivor of child molestation.

In any event, defense counsel did elicit evidence of Divinagracia's denial through Dinah and Norma's testimony.  Dinah testified that Divinagracia denied the sexual abuse allegations during the family meeting.  Specifically, she testified, "[Michael] asked, did you do this?  Did you — did you sexually molest [E.M.]?  And my dad said, no.  He said, no."  According to Dinah, Divinagracia consistently denied any wrongdoing even though Michael and Michelle acted in an intimidating way, standing over him and yelling profanities.  Dinah said that when she and Norma then asked him directly "did you do this," Divinagracia

responded that the allegations were not true. Norma also confirmed this in her testimony. Divinagracia does not show deficient performance on this ground.

### 3) Impeachment Evidence

Divinagracia claims trial counsel performed deficiently by not introducing exculpatory evidence during E.M.'s cross-examination. Specifically, counsel failed to elicit from E.M. that she told investigators that Norma did not wake up during the bedroom incident because she sleeps with earplugs. Divinagracia argues this would have exposed E.M. as a liar because Norma testified that she never wore earplugs to bed. But defense counsel elicited the same evidence from a police detective who testified that E.M. "explained why Norma . . . had not awakened when she was molested in the bedroom . . . . She explained that Norma . . . was wearing ear[ ]plugs." The detective also confirmed that police did not find any earplugs when they searched Divinagracia's home. As much as counsel's failure to cross-examine E.M. on the topic amounts to deficient performance, this evidence cured any harm and allowed the defense to argue E.M.'s credibility to the jury.[8]

### Reference Hearing

Divinagracia invites us to remand his case for a reference hearing. But "only after 'the parties' materials establish the existence of material disputed issues of fact' will we direct the trial court 'to hold a reference hearing in order to resolve the factual questions.' " In re Pers. Restraint of Monschke, 160 Wn. App. 479, 489, 251 P.3d 884 (2010) (quoting Rice, 118 Wn.2d at 886-87). Because

---

[8] Indeed, the jury acquitted Divinagracia of the bedroom incident.

we determine Divinagracia presented no material disputes of fact, we decline his invitation.

We reject Divinagracia's contention that trial counsel performed deficiently and deny his PRP.[9]

WE CONCUR:

---

[9] Divinagracia also argues that we should review his claims of ineffective assistance of counsel as a whole and not in a piecemeal, "balkanized" fashion. But Divinagracia fails to show any deficient conduct. As a result, his claims fail individually and as a whole.